UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | Case No. 3:14-CR-90-2 |
| v. | ) | JUDGE TRAUGER |
| | ) | |
| LONALD ECTOR | ) | |

### SUPPLEMENTAL MOTION FOR COMPASSIONATE RELEASE

Lonald Ector, age 53, has served approximately 38 months of his 121 month sentence for his role in a drug distribution conspiracy in 2014. Before sentencing, he was on pretrial release for nearly three years, where he complied with all conditions of release. Mr. Ector suffers from diabetes, high blood pressure, and atrial fibrillation, and uses a CPAP machine. He is confined at Terminal Island FCI, the federal prison with the third highest number of Covid-19 deaths in the country. Mr. Ector, through his daughter, informed counsel that he tested positive for Covid-19 approximately three weeks ago and that he is still having symptoms.

Mr. Ector respectfully moves this Court to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i), which allows such a reduction based on "extraordinary and compelling reasons." Since he is at high risk of severe harm from Covid-19, he asks that this Court to reduce his sentence by ordering his immediate release, followed by a period in home confinement.

## I. Statutory framework for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i)

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that**--

(i) **extraordinary and compelling reasons warrant such a reduction**; . . .

*****

**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.**

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

The commentary to the Sentencing Commission policy statement identifies some reasons that typically amount to "extraordinary and compelling reasons for a sentence reduction," including:

(A) Medical Condition of the Defendant.—
    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). . . .
    (ii) The defendant is—
        (I) suffering from a serious physical or medical condition,
        (II) suffering from a serious functional or cognitive impairment,
or
        (III) experiencing deteriorating physical or mental health because of the aging process

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, comment. n.1(A). In addition, the commentary advises that "Other Reasons" can also suffice in Note 1(D).

Thus, the statutory requirements for sentence reduction are that the court: (1) find extraordinary and compelling reasons for the reduction; (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a); and (3) ensure any reduction is consistent with applicable policy statements. 18 U.S.C. § 3582(c)(1)(A).

## II. Statement of facts

### A. Background

In 2014, Mr. Ector participated in a conspiracy to sell various drugs. (Presentence Report ("PSR") at ¶ 11-13.) He received only two criminal history points from prior convictions, which were both DUIs. (*Id.* at ¶ 37-38.) He was released on pretrial supervision from October 17, 2014 until he reported on July 17, 2017. While on supervision, he complied with all court-ordered conditions of release. (*Id.* at ¶ 8.) He pleaded guilty and was sentenced to 121 months of custody. (D.E. 1528, Judgment.)

### B. Medical condition

Mr. Ector's presentence report, prepared in 2017, indicates a variety of medical conditions. He suffers from high blood pressure, type 2 diabetes, heart problems, and sleep apnea. (PSR at ¶ 57.) He was under the care of several cardiologists, and was taking the following prescriptions: "glipizide (diabetes),

3

temazepam (insomnia), lisinopril (blood pressure), diltiazem (blood pressure and chest pain), hydralazine (blood pressure), metoprolol (blood pressure and heart failure), metformin (diabetes), warfarin (prevent blood clots), and spironolactone (blood pressure)." (*Id.*) Further, he sleeps with "continuous positive airway pressure (CPAP) mask to help with sleep apnea." (*Id.* at ¶ 58.)

Mr. Ector, through his daughter, indicated to counsel that he tested positive for Covid-19 around April 25.[1] He stated that he still has symptoms and that he had multiple heart surgeries in the past.

Heart conditions, high blood pressure, and diabetes all put Mr. Ector at high risk for suffering severe consequences from Covid-19. According to the Center for Disease Control (CDC), people who have underlying conditions like heart conditions are especially vulnerable to and at higher risk for serious complications from Covid-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

C. **Conditions in the prison where he is confined**

Mr. Ector is housed at Terminal Island FCI. Terminal Island is a low-security correctional institution within the BOP that is supposed to specialize in housing prisoners who need long-term medical or mental-health care.[2] Many were sent there

---

[1] Counsel will file confirmation of test results when it is received from BOP.
[2] Jeremiah Dobruck, *Man serving 26 months for tax fraud is 7th Terminal Island inmate to die*, Long Beach Post News, May 10, 2020, available at https://lbpost.com/news/terminal-island-inmate-dies-7th-700

4
Case 3:14-cr-00090   Document 1688   Filed 05/25/20   Page 4 of 17 PageID #: 7751

because they needed medical care. However, now that prison has the third highest number of deaths from Covid-19 amongst inmates in BOP prisons.[3]

Mr. Ector is housed at a facility that is undergoing a serious outbreak. The ACLU recently filed a class action lawsuit, seeking home confinement and release for medically vulnerable individuals at Terminal Island. (Exhibit A, Complaint.) This Complaint details how ineffectively the prison is managing this crisis. The BOP currently reports that only 36 inmates are currently positive and 647 inmates have recovered.

> Just a week ago, Terminal Island was the site of the largest COVID-19 outbreak at a BOP facility, reporting over 700 positive cases (693 prisoners and 15 staff) as recently as May 11, 2020. By May 15, the number of prisoners mysteriously dropped to 129, with 569 prisoners now being categorized as suddenly being "recovered." As of the morning of May 15, 2020, when accounting for both prisoners who are being reported as "positive" and those being reported as "recovered," BOP reports a total of 697 out of the 1,042 individuals incarcerated at Terminal Island as having recently tested positive for coronavirus—more than every state prison in California combined. *See* Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last accessed May 15, 2020) *compare* California Department of Corrections and Rehabilitation, COVID-19 Preparedness, https://www.cdcr.ca.gov/covid19/ (last accessed May 15, 2020).

(Exhibit A, Complaint at 4.)

It is likely the actual numbers are much higher. *See Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020) (noting that at FCI Elkton, one of the hardest-hit facilities, "it is unlikely that [the BOP's] figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's

---

[3] https://www.bop.gov/coronavirus/.

inmates"); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) ("Zero confirmed COVID-19 cases is not the same thing as zero COVID-19 cases.") (emphasis in original). It is not surprising that the Covid-19 virus is spreading extensively and quickly now that it is clearly present in the prison. *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718, *23 (E.D. Pa. Apr. 1, 2020) (discussing BOP's inadequate response to Covid-19).

As the Court is aware, social distancing is difficult if not impossible in a prison setting,[4] and this is especially true in a low-security facility such as Terminal Island. And given the number of infected, it is impossible for Terminal Island to provide proper medical treatment to all inmates.

### D. Efforts to gain relief from the Bureau of Prisons

Mr. Ector requested compassionate release from the Warden on March 27, 2020. (Exhibit B, Inmate Request.) The statute says a district court can grant a defendant's compassionate-release motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

---

[4] "Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff and visitors." Center for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf; *see also A prison doctor's stark warning on coronavirus, jails and prisons*, L.A. Times (Mar. 20, 2020), *available at* https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration ("Prisons are petri dishes for contagious respiratory illnesses.").

motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). More than 30 days have passed, and this Court can act now.

III. Argument

    A. **Mr. Ector suffers from a serious physical or medical condition that amounts to an extraordinary and compelling reason to reduce his sentence.**

A district court can reduce a final sentence if it finds that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Under the old policy statement, "extraordinary and compelling reasons" to reduce a sentence include a defendant who is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). Mr. Ector's condition meets this standard because his diabetes, heart conditions, and high blood pressure all render him unable to care for himself or protect himself from Covid-19 while in the custody of the BOP.

The government acknowledges that an individual's health conditions, combined with the threat posed by the Covid-19 pandemic, can constitute extraordinary or compelling reasons under § 1B1.13 cmt. n.1(A)(ii). (*See e.g. United States v. Charles Irby,* M.D. Tenn. No. 3:17-cr-70, R. 31, PageID# 159 ("If an inmate shows that he has a serious, chronic condition that has been identified by

7

the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition could potentially satisfy the standard of 'extraordinary and compelling reasons.' Under these circumstances, considering the totality of the circumstances, a chronic condition (*i.e.*, one 'from which [the defendant] is not expected to recover') could reasonably be found to be 'serious' and to 'substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility,' even if that condition would not have constituted an 'extraordinary and compelling reason' absent the risk of COVID-19."))

Even before the Covid-19 pandemic, Mr. Ector was "suffering from [] serious physical or medical condition[s]" from which he will not recover, and those conditions "substantially diminish[]" his ability to provide self-care in his prison. U.S.S.G. § 1B1.13, appl. n. 1(A)(ii). Mr. Ector still suffers from these serious medical conditions, and they him at higher risk for serious complications from Covid-19. Further, Mr. Ector cannot provide self-care and protect himself from Covid-19 while in custody. He is housed at Terminal Island FCI, which, as explained in Section II.C, *supra*, is a site that is already inundated with Covid-19. That is especially true in light of the conditions there, making social distancing impossible and the spread of the virus likely.

With his serious medical conditions and the danger posed by Covid-19, Mr. Ector cannot care for himself safely in his prison environment. Courts have found that the risk of Covid-19, combined with an individual's high-risk health factors, satisfy the language of Application Note 1(A). *See, e.g., United States v. Compagna*,

2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [] Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the RCC") (citing U.S.S.G. § 1B1.13, Application Note 1(A)); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *5 (E.D. Mich. May 7, 2020) ("many courts have found that, for high risk individuals, communal prison confinement conditions satisfy the definition of 'extraordinary and compelling reason for release' because they make it impossible for vulnerable individuals to 'protect [them]selves from the spread of a dangerous and highly contagious virus'"); *United States v. Muniz,* 2020 U.S. Dist. LEXIS 59255, *3-4 (S.D. Tex. Mar. 30, 2020).

This court should immediately reduce Mr. Ector's sentence on the grounds that he is suffering from a serious medical condition that has substantially diminished his ability to provide self-care within his prison environment.

**B. Mr. Ector's high risk of serious health consequences due to Covid-19 amounts to an extraordinary and compelling reason other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A). This further necessitates reduction of his sentence.**

Mr. Ector's risk of complications or death from Covid-19, coupled with the extraordinary nature of the pandemic, also give this Court authority to grant his motion pursuant to Note 1(D). In addition to the reasons listed in the policy statement as listed above, the commentary in Note 1(D) advises that "Other Reasons" can also suffice. Although Note 1(D) is written such that the BOP would

have to pre-approve any such "other reason," such BOP approval is now inconsistent with the text of § 3582(c)(1)(A) as modified by First Step Act because the Act expressly took from the BOP any gatekeeping role. Thus, in the wake of the First Step Act, a district court now has the authority to determine for itself, without BOP approval, what amounts to any other "extraordinary and compelling reason" under the statute. *See, e.g., United States v. Young*, 2020 U.S. Dist. LEXIS 37395, *16-17 (M.D. Tenn. Mar. 4, 2020) (so holding);[5] *United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019); *United States v. Redd*, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020); *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019); *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

Exercising this new authority, several courts have held that the especially high risk of Covid-19 complications to a prisoner can constitute "other reasons providing an extraordinary and compelling reason for compassionate release. *See, e.g., United States v. Gonzalez,* 2020 U.S. Dist. LEXIS 56422, *9-10 (E.D. Wash.

---

[5] This order was modified on April 13, 2020, by removing one phrase that indicated the government conceded this point.

Mar. 31, 2020); *United States v. Rodriguez,* 2020 U.S. Dist. LEXIS 58718, *5 (E.D. Pa. Apr. 1, 2020); *United States v. McCarthy*, 2020 U.S. Dist. LEXIS 61759, *13-14 (D. Conn. Apr. 8, 2020). The courts so finding have emphasized that Covid-19 is bound to spread through BOP facilities, that inmates are powerless to adequately protect themselves from Covid-19, and that a high-risk inmate could suffer "profound" health consequences while, depending on the circumstances, the value of extracting the full custodial punishment from the inmate may be "marginal." *Rodriguez*, 2020 U.S. Dist. LEXIS 58718 at *26; *see United States v. Perez,* 2020 WL 1546422, *2 (S.D.N.Y. Apr. 1, 2020) (following similar reasoning).

Courts have so held even in cases where the defendant has as substantial amount of time left to serve on the sentence, *see, e.g., United States v. Hansen*, 2020 U.S. Dist. LEXIS 61946 (E.D.N.Y. April 8, 2020) (granting release 11 years into a 20-year sentence); *United States v. Bess*, Case No. 1:16-cr-156, 2020 U.S. Dist. LEXIS 71056 (W.D.N.Y. Apr. 22, 2020) (granting release 41 months into an 84-month sentence), or when victims of a crime oppose release, *see, e.g., United States v. Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *6 (S.D.N.Y. Apr. 24, 2020) ("in light of the gravity of her conduct, Ms. Park deserves to spend every day of the sentence that she received in prison. But as other judges across this country have rightly noted, 'we are not currently living under normal circumstances.'").

Mr. Ector's risk of suffering serious and irreparable consequences to his health are especially high because of his conditions described in Section II.B, *supra.* As researchers learn more about Covid-19, heart conditions, high blood pressure,

and diabetes are increasingly seen as dangerous complicating factors—and Mr. Ector suffers from all three. *See, e.g.,* Erika Edwards, *In sickest COVID-19 patients, underlying conditions are common, large study finds: High blood pressure, obesity and diabetes are risk factors for severe cases*, NBC News (April 22, 2020), https://www.nbcnews.com/health/health-news/sickest-covid-19-patients-underlying-conditions-are-common-large-study-n1189906. Recent research indicates Covid-19 may target blood vessels:

> If COVID-19 targets blood vessels, that could also help explain why patients with pre-existing damage to those vessels, for example from diabetes and high blood pressure, face higher risk of serious disease. Recent Centers for Disease Control and Prevention (CDC) data on hospitalized patients in 14 U.S. states found that about one-third had chronic lung disease—but nearly as many had diabetes, and fully half had pre-existing high blood pressure.

Meredith Wadman, *How does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes*, Science (April 17, 2020), https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes.

Mr. Ector's medical vulnerability exposes him to an unacceptably high risk of becoming seriously ill or dying should he contract Covid-19. This Court should conclude that the fact that Mr. Ector faces this risk constitutes an extraordinary and compelling reason for compassionate release.

C.  **Mr. Ector's positive test results make his request for Compassionate Release both more urgent and more compelling.**

Courts are starting to grant compassionate release for individuals who have already tested positive for the virus, recognizing that the BOP is unable to protect

them. In *Fischman,* for example, the court released someone who had tested positive, reasoning that:

> The Court recognizes that the Bureau of Prisons is trying to control the spread of COVID-19 and care for the health and safety of the inmates within its facilities. Yet Mr. Fischman's age and diagnosis put him at heightened risk of becoming seriously ill. The Court finds that these circumstances establish "extraordinary and compelling reasons" warranting Mr. Fischman's immediate release. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

*United States v. Fischman*, No. 16-CR-00246-HSG-1, 2020 WL 2097615, at *2 (N.D. Cal. May 1, 2020). The court discussed the serious outbreak at FCI Terminal Island, where Mr. Fischman was held. It stated that the outbreak was immense, growing exponentially, and observed that "the government could not provide detail about Mr. Fischman's specific treatment status or explain how FCI Terminal Island is ensuring the safety and health of the inmates . . . ." *Id. See also*, *United States v. Johnson*, No. 17-cr-482, ECF 116 (S.D.N.Y. May 1, 2020) (denying without prejudice a motion to release a positive inmate in light of BOP's promise to release him); *United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 10 (D.D.C. May 5, 2020) (releasing an inmate who had tested positive for the virus).

Having already contracted the virus, Mr. Ector is significantly more at risk for serious complications or death should he remain in BOP custody. The conditions of Mr. Ector's "isolation" put him at increased risk. All positive inmates are in close proximity and it is impossible to social distance. Housing all positive inmates in one room or unit is incredibly dangerous because it increases their viral dose. Researchers have pointed out that viruses have more impact when exposure is prolonged or increased:

> The importance of viral dose is being overlooked in discussions of the coronavirus. As with any other poison, viruses are usually more dangerous in larger amounts. Small initial exposures tend to lead to mild or asymptomatic infections, while larger doses can be lethal. From a policy perspective, we need to consider that not all exposures to the coronavirus may be the same. Stepping into an office building that once had someone with the coronavirus in it is not as dangerous as sitting next to that infected person for an hour long train commute. This may seem obvious, but many people are not making this distinction. We need to focus more on preventing high-dose infection.

Joshua Rabinowitz and Caroline Bartman, *These Coronavirus Exposures Might be the Most Dangerous*, NY Times (Apr. 1, 2020), https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html. Mr. Ector is living in a petri dish of Covid-19. Every day, he is absorbing larger doses of the potentially fatal virus. His immediate release is necessary because the prison is simply unable to protect him.

In light of the (rapidly growing) number of positive cases, the prison is far beyond its capacity to provide adequate medical care to its residents. It is safe to assume that there are not enough isolation units or infirmary beds for the positive Covid-19 inmates, or enough doctors or nurses to treat them. Nor are there enough correctional officers to continuously check on these positive inmates to bring them to the infirmary or hospital when they are showing signs of illness or decline. This is especially frightening because individuals with Covid-19 can deteriorate rapidly, even after being generally asymptomatic. Meredith Wadman, *How does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes*, Science (April 17, 2020), https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes (noting

that some patients deteriorate "quite suddenly. . . . Commonly, these patients end up on ventilators. Many die."). The danger posed by a Covid-19 infection is severe for everyone, even young healthy individuals. But Mr. Ector is at an especially high risk due to his health conditions. There is no indication that BOP is isolating high-risk positive inmates separately from the other positive inmates; it is not making efforts to decrease their viral load or to better monitor their health.

Moreover, if Mr. Ector survives his current bout with Covid-19, "[t]here is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection." Scientific Brief, *"Immunity passports" in the context of COVID-19*, World Health Organization (Apr. 24, 2020), available at https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19. In other words, his continued presence among infected individuals at Terminal Island means that he could get infected again.

Terminal Island FCI has already proved it is unable to protect Mr. Ector—he has already become infected. "[E]ach day, perhaps each hour, that elapses threatens incarcerated defendants with greater peril." *United States v. Gross*, No. 15-cr- 769, 2020 WL1673244, at *3 (S.D.N.Y. Apr. 6, 2020) (citations omitted). Mr. Ector respectfully requests that this Court order his immediate release.

### D. Under § 3553(a), the Court should release Mr. Ector and possibly require him to serve a period in home confinement.

Where, as here, extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).

15

Case 3:14-cr-00090 Document 1688 Filed 05/25/20 Page 15 of 17 PageID #: 7762

Mr. Ector has served 38 months of his 121 month sentence. Before sentencing, he was on pretrial release for nearly three years without incurring any violations. He clearly does not pose a danger, especially at his age of 53 and with his current health conditions. (Ex. C, USSC Recidivism Study (showing sharp drop in recidivism around age 50).) If released, Mr. Ector can reside with his wife Patricia Green in Highland, CA. Counsel has provided information regarding Mrs. Green to the U.S. Probation Office.

In sum, Mr. Ector respectfully requests that the Court reduce his sentence to time served, possibly to be followed by a period of home detention. *United States v. Perez,* 2020 WL 1546422, *2 (S.D.N.Y. Apr. 1, 2020) ("The benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave."); *Rodriguez,* 2020 U.S. Dist. LEXIS 58718 at *26 (following similar logic). Such a sentence would reflect the seriousness of his offense, would adequately serve the need for deterrence, and it would likewise serve the purposes of further promoting his rehabilitation.

## IV. Conclusion

Mr. Ector respectfully asks that the Court, acting pursuant to either Note 1(A) or 1(D) of U.S.S.G. § 1B1.13, reduce his custodial sentence to time served and to possibly order him to serve a period of his supervision in home confinement. He also asks that the Court order the government to respond to this motion in an expedited manner and to provide a copy of his BOP medical records.

Respectfully submitted,

s/ *Michael C. Holley*
MICHAEL C. HOLLEY
Assistant Federal Public Defender
MOLLY ROSE GREEN
Research and Writing Attorney
810 Broadway, Suite 200
Nashville, Tennessee 37203
615-736-5047

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2020, I electronically filed this pleading with the U.S. District Court Clerk by using the CM/ECF system, which will send a Notice of Electronic Filing to Joseph P. Montminy, Assistant United States Attorney, Office of the U.S. Attorney, 110 Ninth Avenue North, Suite A961, Nashville, Tennessee, 37203.

s/ *Michael C. Holley*
MICHAEL C. HOLLEY